Recc. pt # 066955

ORIGINAL

FILED
AUG 7 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CONSOLIDATED SUPPLIERS AND CONTRACTORS CO.

v.

THE UNITED STATES.

Case No. 07-598 C

# COMPLAINT

COMES NOW, Plaintiff Consolidated Suppliers and Contractors Co. ("CSC"), by and though its undersigned counsel, and alleges as follows for its Complaint against the United States, acting through the Department of the Army and the Defense Intelligence Agency ("DIA").

## Nature of the Action

1. This is an action for relief under the Contract Disputes Act ("CDA") of 1978 (41 U.S.C. §§601-613) and the Tucker Act (28 U.S.C. §1491), for monies due and owed to Plaintiff CSC under Contract MDA908-03-M-8002 (the "Contract") for labor and materials provided by CSC to the Department of the Army and the Defense Intelligence Agency during wartime conditions in Iraq during the summer of 2003, in the total sum certain amount of $2,937,460.00, excluding interest. Although CSC has submitted invoices to the Virginia Contracting Activity ("VCA") totaling $2,937,460.00 for goods and services that CSC provided under the Contract, the VCA has not paid any money on those invoices to CSC to date, nor has the Contracting Officer issued a Final Decision despite repeated demands and despite the expiration of all applicable deadlines for such a decision to be made. Thus, CSC requests that judgment be entered against Defendant in the amount of $2,937,460.00, plus interest accrued and accruing

under the CDA and the Prompt Payment Act of 1983 ("PPA"), and attorneys fees and other claim preparation costs expended herein.

**Jurisdiction and Timeliness**

2. CSC has fully complied with the CDA requirement that all contractor claims against the Government relating to a contract shall be presented to the Contracting Officer in writing and if for an amount greater than $100,000.00, the claims shall be certified. 41 U.S.C. § 605(a) & (c)(1).

3. This matter has been pending well in excess of the 60-day period afforded under the CDA for the Contracting Officer to render a decision on the claim, and despite repeated requests, the Contracting Officer has failed to render an agency decision and therefore the claim is "deemed" denied pursuant to 41 U.S.C. § 605(c)(5).

4. Accordingly, this Court has jurisdiction to adjudicate CSC's claim against the Government *de novo*.

**The Parties**

5. CSC is a Kuwaiti-based company that has performed and continues to perform work for the United States Government, mostly in the Middle East region.

6. Defendant is the United States, acting through the Department of the Army and the Defense Intelligence Agency.

**Statement of Relevant Facts**

**A. The Renovation of Camp Slayer**

7. In the Spring of 2003, the Department of the Army and the Defense Intelligence Agency ("DIA") deployed a Logistics Support Element ("LSE") to support a contingency operations mission in Iraq.

8. The stated purpose of the mission was to establish a support base ("Camp Slayer") in Iraq, which was to operate and function as the primary collection point for documents and materials relating to weapons of mass destruction.

9. Additionally, Camp Slayer was to serve as a repository in Iraq for the eventual evacuation of all documents to Qatar (where the documents would be translated, catalogued, and processed for intelligence purposes).

10. At the time of the deployment, Camp Slayer had sustained substantial damage as a result of the war. As Camp Slayer was a crucial component of the United States' efforts in Iraq, the DIA was charged, in part, with rebuilding Camp Slayer and ensuring that its buildings and barracks were operationally ready for designated military staffing functions.

11. In light of the exigent circumstances, the DIA solicited local contractors to expeditiously assist with reconstructing and renovating Camp Slayer (the "Reconstruction Project").

12. The VCA served as the contracting agency for the DIA's procurement of goods and services in support of the reconstruction and renovation of Camp Slayer.

13. One of the local contractors that the DIA approached to assist with the Reconstruction Project was Stephen D'Costa, President of Kuwaiti-based CSC.

14. D'Costa had substantial experience and established connections in the Kuwait/Iraq region, and therefore was uniquely positioned to provide the DIA with a variety of goods and services in furtherance of the Reconstruction Project.

**B. The DIA Contracts with CSC to Assist with the Reconstruction Project**

15. In May of 2003, Major Willis Brice, a VCA Contracting Officer stationed at Crown Plaza Hotel in Kuwait, approached D'Costa to inquire as to whether CSC could provide goods and services as part of the DIA's Camp Slayer Reconstruction Project.

16. Major Brice initially asked D'Costa whether CSC could provide, transport (from Kuwait to Baghdad), install, and thereafter service, shower units and air conditioner units at Camp Slayer.

17. When D'Costa inquired about the method of payment, Major Brice informed D'Costa that payment would be effectuated through the Government-wide International Merchant Purchase Authorization Card (commonly referred to as the "IMPAC").

18. During this time period, it was a customary practice of the U.S. military to use the IMPAC to facilitate its purchase of goods and services in the Iraq region, and the GSA has routinely recognized the Army as the largest user of the IMPAC.

19. As the DIA sought to have the shower units installed immediately, Major Brice and D'Costa focused their attention on working out an agreement whereby CSC would provide, install, and service 20 shower units at Camp Slayer.

20. On or about May 31, 2005, in an email to Major Brice, D'Costa confirmed that CSC could complete this task and offered to do so for 9,000 Kuwaiti Dinars ("KD").

21. The DIA accepted CSC's offer and the parties codified their agreement in Contract MDA908-03-M-8002 (the "Contract").

22. Thereafter, the parties continued to discuss other goods and services that CSC could provide at Camp Slayer, and D'Costa understood from Major Brice that such goods and services would fall within the ambit of the Contract.

**C. The DIA Requests Additional Goods and Services From CSC Under the Contract**

23. On or about June 4, 2003, CSC departed Kuwait for Camp Slayer to transport and install the shower units per the Contract, and upon arriving at Camp Slayer, D'Costa and his staff were greeted by a number of DIA officers, including Mr. Luis Ayala (Chief, Project Management Branch), Wahid Elgayar (Paying Agent, IMPAC card holder), and Col. Rowland Cooper (Cdr., ISG Camp Slayer).

24. On or about June 5, 2003, a team of DIA officers provided D'Costa and his staff with a site survey of Camp Slayer. Throughout the site survey, the DIA officers explained to D'Costa that the DIA was in urgent need of local contractors to renovate and construct operationally ready buildings and barracks for various U.S. military staffing functions.

25. When D'Costa apprised the DIA officers of his background and CSC's qualifications to assist with the Reconstruction Project, they requested CSC's assistance with a couple of "test" projects. The DIA officers explained to D'Costa that if CSC adequately performed these "test" projects, then they would utilize CSC's services on a much larger scale.

26. In response to the DIA's proposal, D'Costa inquired as to the method of payment for CSC's performance on these "test" projects. The DIA officers explained that, due to the exigent circumstances at hand, any and all payments would be facilitated through the IMPAC on a "cash and carry" basis.

27. Additionally, D'Costa asked whether another contract would be necessary for CSC to perform these "test" projects at Camp Slayer. The DIA confirmed D'Costa's

understanding that such goods and services would fall within the confines of the already executed Contract and that the terms of the Contract would govern any future work performed by CSC on the Reconstruction Project.

28. Based on these assurances from the DIA officers (e.g., that CSC would be compensated through the IMPAC and that any services provided by CSC to the DIA would fall under the Contract), CSC agreed to take on the "test" projects.

29. Upon returning to Kuwait, D'Costa immediately informed Major Brice of his conversations with the DIA officers as well as CSC's agreement to provide additional goods and services at Camp Slayer. In response, Major Brice expressed his support for CSC and openly stated that he would provide D'Costa with whatever authority that CSC needed to travel the Military Supply Routes ("MSRs") from Kuwait to Baghdad.

30. In the days following CSC's return from Camp Slayer, Major Brice and D'Costa continued their previous conversations regarding CSC's assistance with other aspects of the Reconstruction Project.

31. These discussions culminated in an agreement whereby CSC agreed to provide and install a number of air conditioner units at Camp Slayer, as well as provide, install, and service additional shower units.

32. The parties agreed that CSC would be paid for these additional goods and services through the IMPAC.

33. On June 9, 2003, D'Costa advised Major Brice and DIA officers that CSC would be departing Kuwait for Iraq on the morning of June 11, 2003 with air conditioning units, electrical materials, and plumbing materials to fit and install at Camp Slayer.

34. In response, Lt. Col. Alcorn authorized CSC's movement into the Iraqi Theatre region and "through all checkpoints to Baghdad" and CSC arrived at Camp Slayer on or about June 12, 2003.

35. While at Camp Slayer, CSC not only installed the air conditioner units but also completed the "test" projects that had been agreed to by the parties during CSC's previous visit to Camp Slayer.

36. The DIA was greatly impressed with CSC's work on the "test" projects. Particularly, the DIA took special interest in CSC's ability to quickly procure goods from local markets in Baghdad.

37. As a result of the war, traveling to and from the Baghdad markets during this time period was extremely dangerous for a contractor and required D'Costa and his staff to risk their lives.

38. The DIA paid Mr. D'Costa a total of $90,000.00 through the IMPAC card of Mr. Walid Elgayar for the "test" projects.

39. Given CSC's satisfactory work on the "test" projects, the DIA asked CSC to take on the much larger task of renovating barracks as well as remodeling several offices and officer quarters.

40. As he had previously done with the "test" projects, D'Costa inquired as to how CSC would be paid and whether another contract was needed for CSC's performance of these tasks, and he was again assured by an authorized representative of DIA that, per the Contract, CSC would be paid through the IMPAC upon its submission of invoices to the DIA.

41. Based on the DIA's commitment and the terms of the Contract, CSC agreed to take on a number of additional projects at Camp Slayer.

42. Over the next few weeks, D'Costa and his staff traveled to and from Baghdad with supplies for renovating Camp Slayer.

43. Among other things, CSC transported and installed additional shower units, renovated and remodeled barracks and officer quarters, transported and installed additional air conditioning units, removed an abandoned crane, and provided the DIA with a new forklift.

44. Throughout this entire period, D'Costa remained in consistent communication with Major Brice as well as a number of DIA officers at Camp Slayer.

45. Not only were the DIA and the VCA aware of and accepted each and every facet of CSC's performance at Camp Slayer rendered at the Government's express request, but they provided CSC with the requisite authorization it needed for transporting materials and supplies along the MSRs.

46. By early July 2003, CSC had established itself as one of the most reliable local contractors at Camp Slayer. CSC developed a reputation for quickly acquiring goods from the war-stricken Baghdad markets and for expeditiously completing each of the projects requested by the DIA, and the DIA routinely praised CSC for its contributions to the Reconstruction Project and increasingly looked to CSC to take on additional projects.

47. Upon completing each series of projects, CSC provided the DIA with invoices that itemized the description, quantity, and price for each good and/or service that it provided at Camp Slayer.

48. These invoices rightly reflected the acquisition prices of the Baghdad markets, and the DIA accepted CSC's charges as fair given the circumstances.

49. Most of the prices CSC charged in these invoices were the same prices that it charged in the prior invoices for the "test" projects that were timely paid by the DIA.

50. As is customary during a time of war, there is an increase in the demand for goods and supplies and merchants inflate prices to reflect a waning supply. Such was the case in Baghdad where local merchants charged buyers such as CSC a substantial premium over "normal" non-combat prices.

51. For some goods supplied at Camp Slayer, CSC charged the DIA less than its cost from the supplier.

52. The DIA, by its Chief of the Project Management Branch Luis Ayala, signed off on most of CSC's invoices and acknowledged that it had in fact received the goods and services detailed in CSC's invoices.

**D. VCA Breaches the Contract**

53. Despite its commitment to pay CSC, with the IMPAC or otherwise, the DIA failed to pay CSC for any of the goods and services that CSC had furnished to the DIA through early July 2003.

54. As instructed by DIA officers, D'Costa sought to collect the amounts due and owed CSC up to that point -- nearly $2,000,000.00 -- from Major Brice, who served as the VCA Contracting Officer for the DIA Reconstruction Project and had executed the Contract under which CSC performed work at Camp Slayer.

55. Although Major Brice was well aware of the goods and services that CSC had provided at Camp Slayer in furtherance of the Reconstruction Project -- and, in fact, had provided CSC with permission to utilize MSRs for transporting goods and supplies -- he suddenly and inexplicably refused to pay CSC and claimed that the DIA had exceeded its authority by approving IMPAC transactions that exceeded the $15,000.00 threshold.

56. Upon learning of Major Brice's position, D'Costa sought the DIA's assistance -- particularly Mr. Ayala -- to resolve the issue. In response, Mr. Ayala informed D'Costa that he was reworking CSC's invoices so that the DIA could furnish payment with the IMPAC.

57. Mr. Ayala assured D'Costa that Major Brice (as well as Mr. Ayala's boss in Washington) was aware of the "dire need to make necessary repairs" at Camp Slayer and promised that "we will work things out."

58. Based on Mr. Ayala's commitment and in reliance on the Contract, CSC continued working on an assortment of projects at Camp Slayer through August, 2003.

59. CSC was widely recognized for this work. For example, Mr. Ayala stated that CSC "really saved [the DIA's] bacon when KBR fell down" and that "[CSC's] crew know[s] more about Camp Slayer than anyone else here."

**E. VCA Initiates a Purported "Ratification" Process**

60. Over the next several months, D'Costa engaged in several discussions with the VCA and the DIA regarding the outstanding balance owed to CSC for its work at Camp Slayer.

61. In August 2004, the DIA initiated a purported "ratification" process for the goods and services furnished by CSC at Camp Slayer.

62. This purported "ratification" was not conducted by DIA in accordance with governing rules and regulations, and CSC was not afforded an opportunity for any real input.

63. In an e-mail letter dated February 1, 2005, Mike Patrom, Senior Contract Specialist for the Virginia Contracting Activity, informed CSC's representative that through the purported "ratification" process, the DIA expressly acknowledged "1) that services were provided to and accepted by the Government and 2) that the Government received a benefit as a result of the services performed by" CSC.

64. Mr. Patrom stated in this e-mail that he had all of CSC's invoices in hand, and that the only "issue that remains in question is the cost/price for such services."

65. Despite having all of CSC's invoices totaling $2,937,460.00, the DIA through its purported "ratification" only approved payment of $756,469.80 -- nearly $2.3 million less than the amount the DIA had agreed to pay CSC for its provision of goods and services at Camp Slayer.

66. In the purported "ratification", the DIA drastically reduced invoices without explanation or justification, and completely ignored eight invoices altogether totaling almost one million dollars.

67. One particular CSC invoice (#50001) in the amount of $85,000.00 for the supply of a new forklift was ignored altogether, even though Major Brice himself gave CSC written authorization to move the forklift from Kuwait to Baghdad, and Major Brice personally escorted CSC through at the border with the forklift and other goods.

68. Even though the Government requested and accepted all of these goods and services contained in the invoices, it has refused to pay CSC the amounts due and owing under the invoices despite repeated demand.

69. The Government has expressly taken the position that it does not dispute that CSC provided all the goods and services reflected in the invoices at issue in this case, and that the only issue is the fair and reasonable price to be paid to CSC for those goods and services.

70. The prices reflected in CSC's invoices, totaling $2,937,460.00, are fair and reasonable prices for the goods and services provided to the Government given the facts and circumstances under which the work was performed.

**Count 1: Breach of Contract**

71. CSC fully incorporates the foregoing Paragraphs herein.

72. The United States contracted with CSC to provide goods and perform services related to the renovation of Camp Slayer in Iraq.

73. CSC fully and satisfactorily performed all of the work it was contracted to perform for the United States at Camp Slayer.

74. The United States fully authorized and accepted the goods and services provided by CSC at Camp Slayer.

75. Despite repeated requests, the United States has failed to pay CSC for the goods and services provided at Camp Slayer.

76. Accordingly, the United States has breached its contract with CSC by failing to pay for the goods and services provided at Camp Slayer.

77. As a result of this breach, CSC is entitled to payment on its invoices in the total amount of $2,937,460.00, plus interest accrued and accruing under the CDA and the PPA, and attorney's fees and other claim preparation costs expended herein.

**WHEREFORE,** based on the above, CSC hereby requests payment of $2,937,460.00, plus all allowable interest under the CDA and PPA, reasonable attorney's fees, costs including all claim preparation expenses incurred herein, and any other appropriate relief.

Respectfully submitted,

Sarah Zaffina, Esq.
Seth C. Berenzweig, Esq.
Declan C. Leonard, Esq.
ALBO & OBLON, LLP
2200 Clarendon Boulevard
Suite 1201
Arlington, Virginia 22201
Telephone: (703) 312-0410
Facsimile: (703) 312-0415

*Counsel for Consolidated Suppliers and Contractors Co.*

Dated: 8/6/07